IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RUBY JEAN LOWRY,                    )
                                    )
        Plaintiff,                  )
                                    )
        vs.                         )    Civil Action No. 10-672
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

**MEMORANDUM OPINION**

## I.    **INTRODUCTION**

Pending before the Court are cross-motions for summary judgment

filed by Plaintiff Ruby Jean Lowry and Defendant Michael J. Astrue,

Commissioner of Social Security. Plaintiff seeks review of final

decisions by the Commissioner denying her claims for disability

insurance benefits ("DIB") and disabled widow's benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the

reasons discussed below, Defendant's motion is granted and

Plaintiff's motion is denied.

## II.   **BACKGROUND**

### A.    Factual Background

Plaintiff Ruby Jean Lowry was born on February 23, 1948.

(Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 5, "Tr.," at 74.) Although the record does not show precisely what work she performed after dropping out of school at the end of the ninth grade, Ms. Lowry stated that for several years, she was a "stay at home mom and grandmother." (Tr. 75.) Plaintiff worked as a janitor and landscaper for the City of Pittsburgh Housing Authority between 1989 and 1994. (Tr. 89-90.)

Ms. Lowry was injured in an automobile accident on August 18, 1994, when her car flipped over and landed on its roof. (Tr. 263.) As a result of the accident, Plaintiff developed severe neck and lower back pain which was first treated conservatively with physical therapy but eventually required surgery on her neck to repair a herniated disk. (Tr. 249-251.) Ms. Lowry did not return to work after the accident.

Plaintiff had married Ronald Lowry on April 26, 1969; Mr. Lowry died on December 1, 1989. (Tr. 74-75.)

B.    Procedural Background

Ms. Lowry applied for disabled widow benefits and disability benefits in September 2006, stating that she was unable to work due to neck pain, back pain, hepatitis C, liver problems, and a broken right ankle. (Tr. 74-79; 80-85; 104.) The Social Security Administration denied these applications on January 3, 2007, because there was no evidence that her impairments would have been disabling prior to the date she was last eligible for disabled

2

widow benefits, that is, December 31, 1996. (Tr. 52-54; 58-62.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 2, 2008, before Judge James Bukes, in Pittsburgh, Pennsylvania. Ms. Lowry was not represented by an attorney, but by her sister. Plaintiff testified, as did an impartial vocational expert ("VE"), Mary Beth Kopar. Judge Bukes issued his decision on August 4, 2008, again denying benefits. (Tr. 8-19.) On March 29, 2010, the Social Security Appeals Council advised Ms. Lowry that it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-3.) Therefore, the August 4, 2008 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). On May 17, 2010, now represented by counsel, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

## C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

3

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is

supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **ANALYSIS**

### A.  The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[1] currently existing in the national economy.  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  A claimant seeking DIB must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured.  42

---

[1]  According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

U.S.C.§ 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not deny that Ms. Lowry satisfied the first two non-medical requirements and the parties do not dispute the ALJ's finding that Plaintiff's date last insured was September 30, 1994.

To receive widow's disability benefits, the claimant must show that "she is (1) at least 50 but less than 60 years old; (2) the widow of a wage earner; and (3) under a disability as defined in 42 U.S.C. § 423(d)(2)(A)." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 543 (3d Cir. 2003), citing 42 U.S.C. § 402(e)(1). The standard for demonstrating disability when seeking widow's benefits is the same as the previously described general disability standard. 20 C.F.R. § 404.335(c); see also § 404.1505. The disability must have "started not later than 7 years after the insured died." 20 C.F.R. § 404.335(c)(1). The parties do not dispute the ALJ's findings that Ms. Lowry met the non-disability requirements for disabled widow's benefits, i.e., she is the unmarried widow of a deceased insured and attained the age of 50 on February 23, 1998. Inasmuch as Mr. Lowry died on December 1, 1989, the date on which Ms. Lowry was last insured for purposes of disabled widow's benefits was December 31, 1996 -- the end of the 84th month (seventh year) after her husband died.

To determine a claimant's rights to DIB,[2] the ALJ conducts a

---

[2] The same test is used to determine disability for purposes of receiving either DIB or Supplemental Security Income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely

formal five-step evaluation:

- (1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

- (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

- (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

- (4) if the claimant retains sufficient residual functional capacity ("RFC")[3] to perform her past relevant work, she is not disabled; and

- (5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 404.1520; *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing

---

consider case law developed under both programs.

[3] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

work which is available in the national economy.[4]   Sykes v. Apfel,
228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Bukes first concluded
Ms. Lowry had not engaged in substantial gainful activity since
September 1994, the alleged onset date of her disability.  (Tr. 14.)
In resolving step two, the ALJ found that through the latest possible
date on which Ms. Lowry could maintain eligibility for widow's
benefits, December 31, 1996, Plaintiff suffered from only one severe
impairment, i.e., status post anterior discectomy and fusion
surgery.  (Id.)  Although in her application for benefits, Ms. Lowry
also claimed disability due to neck pain, back pain, hepatitis C,
liver problems and a broken ankle, the medical evidence showed that
these conditions either did not occur until after December 31, 1996,
(e.g., the broken ankle in 2005 and the diagnosis of hepatitis C in
2006), or did not cause disabling symptoms (e.g., numbness and pain
in her hands, shoulders, head, legs and feet) until after that date.

At step three, the ALJ concluded none of Plaintiff's
impairments, considered singly or in combination, satisfied the
criteria of any relevant Listing, in particular, Listing 1.00,
pertaining to the musculoskeletal system.  At step four, the ALJ

---

[4]   Step three involves a conclusive presumption based on the listings,
therefore, neither party bears the burden of proof at that stage.  Sykes,
228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5
(1987).

8

concluded that as of January 1, 1997, Plaintiff retained the residual functional capacity to perform a full range of sedentary work.[5] (Tr. 15.) Because she was limited to sedentary work, she could not perform her past relevant work as either a cleaner/janitor or a landscaper, both of which the VE, Ms. Kopar, described as heavy, unskilled work. (Tr. 16, 48.) Based on Plaintiff's age as of September 1994, the alleged onset date of her disability, or on December 31, 1996, the last date she was eligible for disabled widow's benefits, her limited education, the ability to communicate in English, and her residual functional capacity, as well as Ms. Kopar's testimony, the ALJ concluded that jobs existed in significant numbers in the economy which Plaintiff could perform despite her limitations, for example, surveillance systems monitor, telephone quote clerk, and order clerk. (Tr. 17.) Thus, she had not been under a disability at any time between September 1994 and the date of the ALJ's decision and, consequently, was not entitled to benefits. (Tr. 26-27.)

_____

5 The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day. Social Security Ruling 83-10.

9

## B. Plaintiff's Arguments

Ms. Lowry raises two arguments in her brief in support of the motion for summary judgment. (Doc. No. 8, "Plf.'s Brief.") First, she argues that the ALJ erred by improperly weighing the opinions of her treating physicians and engaging in his own medical diagnoses. (Id. at 5-7.) She takes particular exception to the ALJ's statement that

> [a]lthough the claimant testified to having a myriad of symptoms, including numbness in her hands, difficulty walking and standing, fatigue, and an inability to sit for long, the record shows that her current health conditions started long after January 1, 1997.

(Plf.'s Brief at 6, citing Tr. 15.)

Ms. Lowry contends that this represents a conclusion Judge Bukes "came to on his own and does not reflect information that was obtained through medical records." To the contrary, evidence from April 15 and June 7, 1996, regarding back, neck and arm pain, together with occasional bilateral hand numbness, shows that her problems started "much earlier" than January 1, 1997, and were being treated by neurological specialists well before her date last insured. (Plf.'s Brief at 6-7.)

Plaintiff's second argument is that the ALJ incorrectly accepted the testimony of the Vocational Expert that someone with her characteristics could perform such jobs as surveillance system monitor, telephone quotation clerk, or order clerk because her

10

limited ninth grade education does not provide the reasoning, math and language skills necessary to perform those occupations. Therefore, remand is necessary in order to allow the ALJ to consider Plaintiff's limited education in his ultimate decision that there are jobs available in the national economy which Ms. Lowry could perform. (Plf.'s Brief at 7-9.)

We consider each of these arguments in turn, keeping in mind that to receive either form of benefits, Ms. Lowry must establish disability on or before September 30, 1994, to receive benefits on the basis of her own work history or alternatively, on or before December 31, 1996, the end of the 84th month following her husband's death.

1. *The ALJ erred by failing to accept the findings of Plaintiff's treating physicians and improperly substituting his own medical opinions:* The Court has carefully reviewed the medical evidence for the period between the date of Ms. Lowry's accident on August 18, 1994, and December 31, 1996. The record contains no medical records from her treatment immediately following the accident, but a summary of her post-accident treatment appears in the report of a neurosurgical consultation by Dr. Parviz Baghai on September 29, 1994. Dr. Baghai noted that cervical x-rays taken in the emergency room after the accident revealed no fractures; she was prescribed pain medication and followed up with Dr. Evelyn Berwick,

11

Plaintiff's primary care physician. Ms. Lowry had started a physical therapy program in mid-September, but was still experiencing pain in her neck radiating into both arms, more frequently on the right than on the left. The pain was constant and aggravated in the sitting position. On physical examination, the pain was exacerbated by extension of her neck and she had tenderness in the cervical spinous processes along the medial border of both scapulae, but no paracervical spasm. Dr. Baghai's review of the emergency room x-rays and an MRI done on August 30, 1994, showed evidence of a degenerative process at the fifth cervical vertebrae, central disc protrusion at the C5-6 level, but no nerve root compression. Dr. Baghai suggested that Plaintiff continue with physical therapy for two or three more weeks, but if she did not receive significant benefit from that, she would need to proceed with myelography.[6] (Tr. 263-264.)

In June 1995, Ms. Lowry was again seen by Dr. Baghai who noted that despite physical therapy, she was continuing to experience pain in both arms, neck and lower back, along with numbness in her fingertips, weakness of the right hand, and sharp pain in her right leg. She had not undergone the myelography that had been recommended

6 Myelography is the radiographic visualization of the spinal cord after injection of a contrast medium into the spinal column. *See* the medical dictionary at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus/ (last visited November 15, 2010), "Medline Plus."

12

the previous September. Dr. Baghai noted limited range of motion, positive straight leg raising on the right, but no "clear cut evidence of motor or sensory deficit in the lower extremities." His diagnoses were persistent cervical radiculopathy and possible lumbar radiculopathy. [7]  He again recommended the lumbar and cervical myelography. (Tr. 262.)

Ms. Lowry had the myelograms recommended on June 30, 1995. They revealed posterior osteophytes (bony outgrowths) on C5 and C6, resulting in bilateral impingement of the nerve root sheaths at that level. Her lumbar myelogram was normal. (Tr. 257.) On the same day, she had a CT scan of the cervical spine with contrast, which revealed that her spine at C4-5 was normal, but at the C5 level, there was prominent spondylosis. [8]  The C6-7 level showed only minimal degenerative change. The impression was cervical spondylosis at C5-6, greater on the right than on the left, but no cord compression. (Tr. 256.)

Ms. Lowry underwent cervical microdiscectomy on September 19, 1995. (Tr. 137-143.) On October 23, 1995, Dr. Baghai reported to Dr. Berwick that Plaintiff was doing well, with some residual pain in the right arm while the pain in her left arm had completely

---

7   Radiculopathy refers to any pathological condition of the nerve roots. *See* medical dictionary at Medline Plus.

8   Spondylosis is a general term for degenerative diseases of the spine. *See* medical dictionary at Medline Plus.

subsided. By November 20, 1995, Dr. Baghai was unable to see any significant mal-alignment on x-rays of her neck or any definitive abnormality. (Tr. 240.)

In April 1996, Plaintiff returned to Dr. Baghai with continuing neck pain and occasional numbness in her hand. She had limited range of motion in her cervical spine, tenderness throughout the paracervical region, and limited ability to extend the cervical spine. However, a neurological exam showed that her motor function in both the upper and lower extremities was grossly normal; there was no sensory deficit; deep tendon reflexes were 2+ and equal on both sides; and there were no long tract signs. Dr. Baghai ordered additional x-rays of the cervical spine to review the status of the cervical fusion and a cervical MRI to rule out further nerve root compression. (Tr. 239.)

Dr. Jory D. Richman, an orthopedic surgeon, examined Ms. Lowery in June 1996. He scheduled her for some electrophysiologic studies because he could not find "any objective evidence of neuropathy or radiculopathy on her clinical exam." The recent MRI of the cervical spine had shown no definite pathology. (Tr. 242.) On July 3, 1996, Dr. Richman wrote again to Dr. Berwick, reporting that physical examination showed no discrete neurological deficits, an MRI of her neck did not reveal any residual nerve compromise, an EMG revealed evidence of either right carpal tunnel syndrome or possible cervical

14

radiculitis.[9] He did not recommend further surgical intervention, but did suggest that Ms. Lowry consult with a chiropractor who studied chronic pain patients and undergo evaluation at the pain clinic at Allegheny General Hospital. (Tr. 234.)

In October 1996, Ms. Lowry consulted with the Back Institute at Allegheny General Hospital, where it was noted that her range of cervical spine motion was limited to 60 degrees flexion and extension. Her subjective report of neck and bilateral arm pain was 10 on a scale of 1 to 10. She was prescribed heat, ultrasound, ice and a TENS unit[10] along with a four-week program of physical therapy based on strengthening, range of motion, and flexibility exercises. (Tr. 233.) This is the last medical report for the relevant period.

We agree with Plaintiff that it is reversible error for an ALJ to substitute his own medical opinion for that of a claimant's treating physician. Morales, 225 F.3d at 317 ("an ALJ should not substitute his lay opinion for the medical opinion of experts.") However, in the passage to which Plaintiff objects, the ALJ did not substitute his own lay opinion for that of any of Plaintiff's treating physicians, he merely stated that the "current health conditions"

9 Radiculitis is inflammation of a nerve root. *See* medical dictionary at Medline Plus.

10 A transcutaneous electrical nerve stimulator or "TENS unit" is a device which electrically stimulates the skin to relieve pain by interfering with the neural transmission of signals from underlying pain receptors. *See* medical dictionary at Medline Plus.

15

of which she complained in her application for benefits, i.e., "neck pain, back pain, Hepatitis C liver problems, and a broken ankle" (see Tr. 104), began long after her date last insured, December 31, 1996. Although he did not differentiate in this sentence between the onset dates of the neck and back pain and those of her other conditions, he did not ignore the other symptoms, i.e., numbness in her hands, difficulty walking and standing, fatigue and an inability to sit for long periods of time, which he discussed at length in other portions of his decision. See, e.g., Tr. 14, referring to "surgery on her neck because of pain and numbness in her neck, arm and fingers;" her diagnosis of cervical radiculopathy due to a herniated C5-6 disc in September 1994; surgery on September 19, 1995; continued reports of pain in her neck, head and back following the surgery; and the treatments with physical therapy that began in October 1996 and continued through at least 2006.

The ALJ was correct in noting that her right ankle fracture and hepatitis C began in 2005 and 2006, respectively. (See Tr. 284-285.) Although Judge Bukes noted that she "began treatment for major depressive disorder in 2007" (see Tr. 404), her psychiatrist's notes from May 22, 2007, indicate that she had been "diagnosed with [major depressive disorder] (chronic since at least 1994.") However, none of the medical records from before January 1, 1997, refer to any mental health problems or treatment.

16

The fact that Ms. Lowry was being treated for neck and back pain before the date last insured does not necessarily lead to the conclusion that these conditions were disabling. As noted above, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Nothing in the medical records for the period August 1994 through December 1996 reflects a physician's opinion that Ms. Lowry's neck, back and hand pain was so severe that she was disabled at that time. We conclude that although the ALJ could have expressed himself more precisely in the sentence to which Plaintiff objects, Judge Bukes did not substitute his own medical opinion for that of Plaintiff's treating physicians. Therefore Plaintiff's first argument seeking remand for further consideration must fail.

2. *The ALJ erred by accepting the VE's testimony that a person with Ms. Lowry's limited education could perform the jobs identified:* At the hearing, Ms. Lowry testified that she had finished the ninth grade, did not earn a general equivalency diploma, and had some vocational education in cooking. (Tr. 34.) The Vocational Expert, Ms. Kopar, described Plaintiff's first former

job, a cleaner, as "unskilled, SVP[11] of two, heavy exertion," and her second job, a landscaper, as "unskilled, SVP of two, heavy exertion." (Tr. 48.) The ALJ then posed a hypothetical question which included a reference to "the Claimant's age, education and work experience," and was limited to sedentary work that would not involve "fine and dexterous movements with the right hand." (Tr. 49.) The VE responded that unskilled, sedentary jobs included surveillance systems monitor, telephone quotation clerk, and order clerk. (Id.) Plaintiff argues that the jobs identified by Ms. Kopar require more advanced reasoning, math and language skills than are reflected in a limited ninth grade education and that the ALJ erred by accepting the VE's testimony that a person with her skills, education and abilities could perform the jobs identified.

Each occupation description in the Dictionary of Occupational Titles ("DOT") contained coded information in what is referred to as the "definition trailer."[12] One bit of information in the trailer is the SVP or specific vocational preparation for the occupation, which

> is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average

---

11 SVP is the abbreviation for "specific vocational preparation," discussed in more detail below.

12 See www.occupationalinfo.org/appendxc_1.html#II. All references and quotations cited as being from the "DOT Trailer" are taken from this website.

18

performance in a specific job-worker situation.

> This training may be acquired in a school, work, military,
> institutional, or vocational environment. It does not
> include the orientation time required of a fully qualified
> worker to become accustomed to the special conditions of
> any new job. Specific vocational training includes:
> vocational education, apprenticeship training, in-plant
> training, on-the-job training, and essential experience
> in other jobs.

DOT Trailer.

SVP levels range from 1 through 9, with level 9 representing

jobs which require over ten years of preparation. Levels 1 and 2

represent unskilled jobs which require only short demonstration of

the tasks to be performed or training of up to and including one month,

that is,

> work which needs little or no judgment to do simple duties
> that can be learned on the job in a short period of time.
> The job may or may not require considerable strength. .
> . . A person does not gain work skills by doing unskilled
> jobs.

20 C.F.R. § 404.1568(a). Skill Requirements.

Another portion of the DOT trailer, and the portion on which

Plaintiff relies for her second argument, explains the general

educational development ("GED") requirements of an occupation. As

noted in the DOT trailer, the GED relates to

> those aspects of education (formal and informal) which are
> required of the worker for satisfactory job performance.
> This is education of a general nature which does not have
> a recognized, fairly specific occupational objective.
> Ordinarily, such education is obtained in elementary
> school, high school, or college.

Each position is described in terms of three areas of GED --
reasoning, mathematics, and language ("R," "M," and "L,"
respectively) and is given a ranking of 1 through 6, with 1 being
the lowest level.

A review of the DOT descriptions of the occupations identified
by the VE at the hearing reveals the following GED and SVP elements:

Surveillance system monitor (DOT 379.367-010):
     GED: R3, M1, L3
     SVP: 2

Telephone quotation clerk (DOT 237.367-046):
     GED: R3, M2, L3
     SVP: 2

Order clerk[13] (DOT 209.567-014):
     GED: R3, M1, L2
     SVP: 2

Reasoning level 3, the level for each of the jobs identified

by the VE, requires the worker to

> apply commonsense understanding to carry out instructions
> furnished in written, oral, or diagrammatic form [and]
> deal with problems involving several concrete variables
> in or from standardized situations.

DOT Trailer.

Mathematical development level 2, the highest level for the

---

13 There are several positions in the DOT referred to as Order Clerks, with
SVP ratings of 2 to 5.   See DOT positions 214.382-014, 249.362-026,
239.262-014, 203.362-010, and 209.567-014.   In her brief, Plaintiff refers
to order clerk 249.362-026, but this position has an SVP rating of 4, which
contradicts the VE's testimony that the job to which she was referring had
an SVP of 2.   The only position with an SVP of 2 is Order Clerk, Food and
Beverage (hotel & restaurant), and the Court has used this description as
its starting point.

20

three occupations, requires the ability to

> add, subtract, multiply, and divide all units of measure.
> Perform the four operations with like common and decimal
> fractions. Compute ratio, rate, and percent. Draw and
> interpret bar graphs. Perform arithmetic operations
> involving all American monetary units.

DOT Trailer.[14]

Language level 3, also the highest level required by the

three positions suggested by the Vocational Expert, indicates

the following abilities:

> Reading: Read a variety of novels, magazines, atlases, and
> encyclopedias. Read safety rules, instructions in the use
> and maintenance of shop tools and equipment, and methods
> and procedures in mechanical drawing and layout work.
> Writing: Write reports and essays with proper format,
> punctuation, spelling, and grammar, using all parts of
> speech. Speaking: Speak before an audience with poise,
> voice control, and confidence, using correct English and
> well-modulated voice.

DOT Trailer.

According to the Social Security regulations, a person whose

formal schooling ended in the seventh through the eleventh grade is

considered to have a "limited education." This means an "ability

in reasoning, arithmetic, and language skills, but not enough to

allow a person with these educational qualifications to do most of

---

14 Mathematical level 1 requires the ability to "[a]dd and subtract two
digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform
the four basic arithmetic operations with coins as part of a dollar. Perform
operations with units such as cup, pint, and quart; inch, foot, and yard;
and ounce and pound." DOT Trailer. Since the levels are ranked from least
to greatest skill levels, each level must logically assume the ability to
perform at all lower levels.

the more complex job duties needed in semi-skilled or skilled jobs."
20 C.F.R. § 404.1564(b)(3). All three occupations identified by the
Vocational Expert were jobs with an SVP of 2, correlating to
unskilled, rather than semi-skilled or skilled work.

In general, in determining the effects of education as a
vocational factor,

> education is primarily used to mean formal schooling or
> other training which contributes to your ability to meet
> vocational requirements, for example, reasoning ability,
> communication skills and arithmetical ability. However
> if you do not have formal schooling, this does not
> necessarily mean that you are uneducated or lack these
> abilities. Past work experience and the kinds of
> responsibilities you had when you were working may show
> that you have intellectual abilities, although you may
> have little formal education. Your daily activities,
> hobbies, or the results of testing may also show that you
> have significant intellectual ability that can be used to
> work.

20 C.F.R. § 404.1564(a).

In a daily activities questionnaire completed in September
2006, Ms. Lowry stated she had no trouble understanding instructions
and carrying them out, could make decisions on her own, and did not
need help taking medications. (Tr. 117.) Plaintiff's
representative at the hearing stated that Ms. Lowry had citations
"from the Housing Authority that would have showed that had she stayed
physically able to work that by now she would be a supervisor, I'm
sure, if not in a better position." (Tr. 30.) Ms. Lowry's grammar
and sentence structure as recorded at the hearing reflect acceptable

22

English language skills.[15]  There is nothing in the abbreviated

mental health treatment records which reflects any limitation in

understanding or the ability to perform basic language, math or

reasoning skills.  Ms. Kopar was present at the hearing and had

reviewed Plaintiff's file.  (Tr. 48.)  She therefore presumably

knew both from the file and from Plaintiff's testimony that her

education had ended at grade nine and took that restriction into

account when asked by the ALJ to consider a claimant with Plaintiff's

"age, education, and work experience."

Even if we were inclined to give more weight to Plaintiff's

argument that the ALJ erred by accepting Ms. Kopar's testimony, case

law on this subject reflects the Social Security Administration's

reliance not on GED levels but on SVP levels.  *See* Ferguson v. Astrue,

CA No. 09-697S, 2010 U.S. Dist. LEXIS 77204, *20 (W.D.N.Y. July 30,

---

15  There may be a difference of opinion about whether Plaintiff's language
development skills were at level 3 since there is no evidence that she had
experience writing reports and essays or in public speaking as required
at that level.  However, language level 2 requires: "Reading: Passive
vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.
Read adventure stories and comic books, looking up unfamiliar words in
dictionary for meaning, spelling, and pronunciation. Read instructions for
assembling model cars and airplanes.  Writing: Write compound and complex
sentences, using cursive style, proper end punctuation, and employing
adjectives and adverbs.  Speaking: Speak clearly and distinctly with
appropriate pauses and emphasis, correct pronunciation, variations in word
order, using present, perfect, and future tenses."  DOT Trailer.  At least
one job, that of Order Clerk, requires language skills at level 2 rather
than 3.  Social Security regulations provide that "work exists when there
are a significant number of jobs in the national economy in *one or more*
occupations," and the ALJ therefore was obligated to identify only one job
that Plaintiff could perform. *See* Ferguson v. Astrue, CA No. 09-697S, 2010
U.S. Dist. LEXIS 77204, *21 (W.D. N.Y. July 30, 2010).

23

2010), *citing* Social Security Ruling 00-4p,[16] which correlates SVP to levels of knowledge required for unskilled, semi-skilled and skilled work. In another case with fact similar to those herein, the plaintiff also objected that the GED levels of the jobs identified by the vocational expert were higher than her personal skills. *See* Deaton v. Comm'r of Soc. Sec., No. 08-5249, 2009 U.S. App. LEXIS 4836, (6th Cir. Mar. 5, 2009). We agree with the Deaton court that the reviewing court must assume that when the ALJ asked the vocational expert to consider a person with the claimant's specific educational level, the expert did so, and the ALJ can therefore rely on that testimony at step five of his analysis. Id. at *12.

Again, similar to the facts of Deaton, Plaintiff here has failed to point to any evidence that the jobs identified by the VE required language, mathematical or reasoning skills above those she possesses. Ms. Lowry argues that she "should be found to only be able to perform simple, repetitive tasks as a result of her limited education." (Plf.'s Brief at 9.) All three jobs identified by the VE have an SVP of 2, indicating unskilled work which requires only

---

16 "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

the ability to do "simple duties." We are not persuaded that the
ALJ erred by accepting the Vocational Expert's testimony that a
person with Ms. Lowry's education and experience could perform the
jobs she had suggested.

Having concluded that neither of Plaintiff's arguments provides
a reason for this Court to reverse the ALJ's decision denying benefits
or to remand for further consideration, Plaintiff's motion for
summary judgment is denied and Defendant's motion is granted. An
appropriate order follows.

November __18__, 2010    _William L. Standish_
                              William L. Standish
                         United States District Judge